Jean C. GRAHAM, Plaintiff,

v.

MALONE FREIGHT LINES, INC., Jerome Washington, Malachi Sabree, East Coast Transport, Inc., and CRST, Inc., Defendants.

C.A. No. 95–11496–NG.

United States District Court, D. Massachusetts.

Nov. 8, 1996.

Jonathan J. Margolis, Lisa R. Valensi, Kushner & Sanders, Wellesley, MA, for plaintiff Jean C. Graham.

Peter L. Puciloski, Sugarman, Rogers, Barshak & Cohen, P.C., Boston, MA, Larry G. Gutz, Moyer & Bergman P.L.C., Cedar Rapids, IN, for defendants Malone Freight Lines, Inc., Jerome Washington, Malachi Sabree, CRST International, Inc., CRST Inc.

William A. Sheridan, Flynn, Sheridan & Tabb, Boston, MA, William C. Sheridan, Gould & Sheridan, Londonderry, NH, Peter L. Puciloski, Sugarman, Rogers, Barshak & Cohen, P.C., Boston, MA, Thomas F.X. Foley, Holmdel, NJ, for defendant East Coast Transport, Inc.

### MEMORANDUM AND ORDER

GERTNER, District Judge.

### I. INTRODUCTION

Plaintiff Jean C. Graham ("Graham") and defendant Jerome Washington ("Washington") were involved in an auto accident in Wellesley, Massachusetts on May 21, 1993. After the accident, Graham sued the following defendants: Washington[1] (for negligence), Malone Freight Lines ("Malone") (for negligence), Malachi Sabree[2] ("Sabree") (for negligence), CRST, Inc. ("CRST") (for violations of M.G.L. c. A), and East Coast Transport, Inc. ("ECT") (for negligence). ECT then cross-claimed against Malone, asserting that any damages to the plaintiff were the result of Malone's negligence, and/or Washington's negligence, and/or Sabree's negligence.

The plaintiff has moved for partial summary judgment against Malone; Malone has cross-moved for summary judgment against the plaintiff and against ECT on its cross-claim; and ECT has moved for summary judgment against the plaintiff. For the reasons stated below, plaintiff's motion is **DENIED**; defendant's Malone's motion is **ALLOWED**; defendant CRST's motion is **ALLOWED**; and defendant ECT's motion is **DENIED**.

### II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment will be granted when all the relevant pleadings, viewed in the light most favorable to the nonmoving party, present no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Aponte–Santiago v. Lopez–Rivera*, 957 F.2d 40, 41 (1st Cir.1992); *Olivera v. Nestle Puerto Rico, Inc.*, 922 F.2d 43, 45 (1st Cir.1990); *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990).

### III. FACTS

On May 21, 1993, at approximately 9:00 a.m., Graham was driving her car north on Route 128 in Wellesley, Massachusetts. When Graham attempted to turn off Route 128, onto eastbound Route 9, the left side of her car was struck by a tractor-trailer. The tractor-trailer had been in the next lane, and according to the accident report, the driver's (Washington) failure to ensure that the exit lane was clear when he entered it caused the accident. Oliver Davidson ("Davidson") was driving behind Graham's car and witnessed the accident. Davidson stopped to see if Graham was alright, and then followed the tractor-trailer until he could attract the driver's attention. After the tractor-trailer stopped, Davidson informed its driver that he had just been involved in an accident and asked that he return back to the scene. The driver said he would do so, but did not. Before returning to the scene of the accident, Davidson took down the tractor-trailer's registration number, its Interstate Commerce Commission[3] ("ICC") number, and the com-

---

1. A default judgment was entered against Washington by this Court on June 6, 1996.

2. Sabree owned the tractor part of the tractor-trailer driven by Washington.

3. By operation of the ICC Termination Act of 1995, 109 Stat. 803 (1995), to be codified at 49 U.S.C. § 101 *et seq.*, the responsibility for regulating motor carrier transportation was vested in the Secretary of Transportation, and subsequently by delegation, in the Federal Highway Administration ("FHA"). The change in responsibility

pany name on its side.[4] The company name on the tractor-trailer read "Malone Freight, Birmingham, Alabama."

The state trooper assigned to investigate the accident, Robert Bousquet, using the information supplied by Davidson, telephoned Malone Freight Lines later that day. Trooper Bousquet learned that Malone had a driver named Jerome Washington with the exact same registration numbers on his tractor-trailer. The Malone representative, Terri Phillips, informed Trooper Bousquet that the actual owner of the tractor was Malachi Sabree. Phillips also told the officer that Malone had fired Washington on April 27, 1993, but that Washington had not yet returned the company's signs or registration materials.

Ownership of the tractor-trailer was complicated. The tractor was actually owned by Sabree, though Washington was making periodic payments to Sabree in an effort to purchase the tractor. Washington did, however, own the trailer; it was registered in Maine to J & E Truck Leasing.[5]

On May 21, 1993, Washington was transporting a load of cucumbers from Florida to Massachusetts on a haul arranged by defendant ECT, not by Malone. As a broker with no ICC operating authority of its own, ECT acts as an intermediary between shippers and carriers and uses operators leased to licensed carriers. The May 21, 1993 job was the fifth haul Washington had transported for ECT; he had begun accepting assignments from ECT on or about April 20, 1993.

At the time of the accident, Washington carried the registration for the tractor-trailer, which had been obtained by Malone when it had entered into a lease with Washington

on April 14, 1993.[6] The lease was officially entitled the "Independent Contractor Operating Agreement" (hereinafter "the lease"). In the document, Washington promised to lease the tractor-trailer to Malone, and Malone agreed to lend its authorizations for interstate commerce to Washington and provide work for him. As a result, the tractor-trailer was registered to Malone on an Illinois temporary tag, valid for 45 days from the date of issue.

According to Malone, on or about April 14, 1993, it instructed Washington to return to Florida and obtain a notarized power of attorney from Sabree which Malone claims it needed in order to process Washington's lease. While at Malone's Alabama facilities, Washington had produced a document which appeared to be a power of attorney, but the document was not notarized.

When Washington left Malone's offices on April 15, 1993, ostensibly to return to Florida and obtain the notarized power of attorney from Sabree, he possessed the following vehicle identification materials: (a) door placards for the tractor in Malone's name; (b) decals for the tractor and trailer with Malone's ICC number; (c) a "cab card" which indicated that the tractor-trailer had Malone's permission to operate under its ICC authority; (d) decals with Malone-assigned numbers; (e) a 45–day temporary tag from the state of Illinois; and (f) 48 state decals, indicating the applicable state taxes had been paid. Washington had already signed Malone's standard lease agreement and completed operator safety training and driving tests. Malone had given Washington's tractor-trailer a unit designation for internal references,[7] and Malone had registered the tractor-trailer in Illinois.

---

does not affect this case since the abolition of the ICC was effective as of January 1, 1996.

**4.** After obtaining a copy of Washington's driver's license from the Florida Registry of Motor Vehicles, Trooper Bousquet showed the photograph to Davidson. Davidson identified Washington as the driver of the tractor-trailer involved in the accident on May 21, 1993.

**5.** J & E Truck Leasing was a business name Washington used.

**6.** Malone had entered into an earlier lease with Washington in October 1992. The lease was cancelled by Malone on December 17, 1992. The reason for termination was that Washington had hauled an unauthorized load of freight, i.e. he had accepted work from another company without first checking with Malone. The 1992 termination notice marked Washington as ineligible to be rehired.

**7.** There is some confusion in the evidence as to whether the unit designation was M9306 or M9307.

Washington never provided Malone with the notarized power of attorney, nor did Malone set up any hauls for Washington. According to Malone, Washington also failed to stay in contact with a Malone dispatcher, as he was required to do by the terms of the Malone Operator Information Manual. Washington disputes this last allegation and states that he was in contact with a dispatcher named "Bill" in Malone's Martins Ferry, Ohio office. However, there are no documents supporting Washington's claims.

Consequently, on April 27, 1993, Malone sent a certified letter to Washington, cancelling the lease and asking for the immediate return of its vehicle identification materials. Washington never received the certified letter; it was returned to Malone on May 19, 1993. The post office tried to deliver the letter on two separate occasions. The first notice was on May 5, 1993; the second notice was on May 11, 1993; and the letter was returned to Malone on May 19, 1993. Under the terms of the lease, notification sent by mail was to be deemed effective two days after it was sent. Malone did not send any other letters to Washington's address until June 18, 1993.

In the interim, Malone made several unsuccessful attempts to contact Washington by telephone. At one point before April 27, 1993, Malone managed to reach Washington's wife, Eva. Mrs. Washington said that she did not know where her husband was, but she knew he had leased his truck to Malone. Malone then informed Mrs. Washington that her husband's lease had been cancelled. It is not entirely clear exactly when the other telephone calls to Washington's home were made, but some calls were made before the accident (May 21, 1993). The call to Mrs. Washington in April 1993 appears to be the only call in which Malone actually reached a member of the Washington household.

Malone sent another letter to Washington on June 18, 1993. The letter noted at the bottom, "Jerome, As of today's date, your plate permits and signs have not been returned. If you return them, we may be able to transfer them to another truck. That would reduce the amount you owe to Malone. Thanks, John." Washington called Malone sometime in June, 1993, after receiving this letter. He returned the vehicle identification materials on July 17, 1993.

As of May 21, 1993, the date of the accident, Washington had not removed Malone's vehicle identification materials from the tractor-trailer. He stated in his deposition that he did not remove the materials until July 1993 and was under the impression until June 1993 that his lease with Malone was still valid.

Malone reported the tractor's plate (# P42214) stolen to the Birmingham police when Washington failed to respond to Malone's entreaties to return the vehicle materials, but did so on June 17, 1993. The reasons for Malone's delay in reporting the missing plate are not quite clear. First, Malone states that it was waiting for Washington to return the materials. Second, Malone claims that it was only contacted by the Massachusetts state trooper investigating the accident on June 17, 1993. But Trooper Bousquet contacted Malone on the date of the accident, May 21, 1993, using the information supplied by Davidson.

## IV. ANALYSIS

This case raises several thorny choice of law issues: the lease between Washington and Malone was signed and negotiated in Alabama; the tractor-trailer was registered in Illinois; and the accident occurred in Massachusetts. Before moving to a discussion of the law, I must first decide what law applies.

### A. Choice of Law Issues

■ A federal court sitting in diversity is required to follow the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Massachusetts' choice of law rules govern this Court's determination of these issues. There are two separate choice of law issues in this case. First: what state law governs the interpretation of the contract between Malone and Washington? Second: what state law governs the negligence counts against the various defendants?

### 1. *Contract Choice of Law*

The choice of law with respect to the contract between Malone and Washington is complex. Traditionally, "the law of the place of the making" determined a contract's governing law. The Massachusetts Supreme Judicial Court ("SJC") has explicitly rejected this traditional rule.[8] In *Bushkin Assocs. v. Raytheon Co.*, 393 Mass. 622, 631, 473 N.E.2d 662 (1985), the SJC held that "various choice-influencing considerations" would determine which state's law governs the interpretation of a contract.[9] The SJC cited the Restatement (Second) of Conflict of Laws as an "obvious source of guidance" for these considerations. *Id.* at 632, 473 N.E.2d 662.[10]

Alabama law governs the contract because the most significant contacts are with Alabama. First, the contract between Malone and Washington includes a forum selection clause, mandating that the contract should be construed in accordance with, and governed by, the laws of the state of Alabama. Massachusetts allows contracting parties to choose the applicable law so long as the transaction bears a reasonable relation to the state chosen. M.G.L. ch. 106 § 1–105 (1995). The Second Restatement has a similar position: the law of the state chosen by the parties to govern their contractual rights should govern unless the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice. *Restatement (Second) of Conflicts* § 187 (1971).

Second, Alabama was the site of most of the important events leading up to the Malone–Washington lease. Malone is based in Trussville, Alabama (a suburb of Birmingham). Washington came to Alabama in April 1993 to lease his services and tractor-trailer to Malone. He had travelled to Alabama one year before to enter another lease with Malone. Washington signed the contract in Alabama, at Malone's Trussville office. According to the Malone Operator's Information Manual, Washington was supposed to stay in contact with a dispatcher in Malone's Trussville office during the life of the lease.

Moreover, there is no sensible alternative to Alabama law. Massachusetts has no relationship to the contract; it was merely the site of the accident. Illinois, the only other state law cited by the parties, relates only to the registration and insurance of the tractor-trailer, not to the lease terms. Given the extensive contacts between Alabama and the contract, as well as the lack of any viable

---

**8.** For all intents and purposes, the changes in the factors governing contracts choice of law questions do not affect the outcome in this case. Alabama is the appropriate forum under either the "place of the making rule" or the more functional approach. Cf. *Fedder v. McClennen*, No. 94–10014–NG (October 24, 1996).

**9.** *Bushkin* followed *Choate, Hall & Stewart v. SCA*, 378 Mass. 535, 541, 392 N.E.2d 1045 (1979), in which the SJC had noted that rigid application of the place of the making rule "can produce awkward or arbitrary results where that place had no or little other connection with the contract or the parties ... and almost all states have replaced 'place of the making' or other one factor tests with a more functional approach." The SJC has continued to chip away at the old rules for conflict of law questions. *See New England Telephone & Telegraph Co. v. Gourdeau Const. Co., Inc.*, 419 Mass. 658, 647 N.E.2d 42 (1995) (holding that "functional approach" of Second Restatement, rather than procedural and substantive labels, governs the decision of whether to apply a forum's statute of limitations).

**10.** The Restatement lists the following contacts as relevant to the contracts inquiry:

(a) the place of the contracting;
(b) the place of negotiation of the contract;
(c) the place of performance;
(d) the location of the subject matter of the contract;
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

*Restatement (Second) of Conflicts* § 188(2) (1971).

Factors to be taken into account by the court in deciding the applicable law include:

(a) the needs of the interstate and international systems;
(b) the relevant policies of the forum;
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
(d) the protection of justified expectations;
(e) the basic policies underlying the particular field of law;
(f) certainty, predictability, and uniformity of result; and
(g) ease in the determination and application of the law to be applied.

*Restatement (Second) of Conflicts* § 6(2) (1971).

alternative, Alabama law governs the contract.

### 2. *Torts Choice of Law*

■ For torts, the old choice of law rule, *lex loci delicti* ("the place of the wrong"), has also been abandoned. Disposition of the substantive choice of law issues in tort turns on "the law of the jurisdiction which has the strongest interest in the resolution of the particular issue presented." *Pevoski v. Pevoski*, 371 Mass. 358, 360, 358 N.E.2d 416 (1976). In *Pevoski*, the SJC held that the rules of the road should be determined by the jurisdiction with the strongest interest in regulating the conduct of the drivers. *Id.* at 359, 358 N.E.2d 416.

■ In this case, two torts are alleged: simple negligence and negligent entrustment. With respect to the car accident itself, and Washington's negligence, Massachusetts law should apply. Massachusetts has a compelling and exclusive interest in enforcing its rules of the road and regulating the conduct of drivers on its roads. The accident occurred in Massachusetts; the plaintiff is a resident of Massachusetts; and Washington was delivering a load of cucumbers to a buyer in Massachusetts when the accident occurred.

■ The choice of law for Graham's negligent entrustment claim against Malone is more complicated. *Pevoski* cautions courts to concentrate on the "particular issue presented." *Id.* Graham's allegations concerning negligent entrustment concern acts which occurred outside of Massachusetts and which involved parties from states other than Massachusetts. Malone is based in Alabama. Washington is a resident of Florida. The effects of the alleged negligence were felt in Massachusetts, i.e. the accident.

Nevertheless, Alabama has a greater interest in regulating Malone's conduct when that conduct occurs in Alabama and involves a contract negotiated in Alabama. The allegedly negligent "entrusting" of Malone's authority for interstate commerce occurred in Alabama. As a result, the negligent entrustment claim against Malone should be governed by Alabama law.

■ The same logic applies to the plaintiff's claim against ECT. Any negligence on ECT's part occurred in New Jersey; ECT itself is based in New Jersey. Plaintiff's negligence claim against ECT should be governed by New Jersey's law of negligence.

### B. *Claims Against Malone*

#### 1. Liability Deriving from Malone's Lease with *Washington*

The plaintiff has argued that Malone is liable for the accident under the terms of its lease with Washington. In vain, Malone argues there was no real agreement because its validity was subject to the condition that Washington obtain a notarized power of attorney from Sabree. Since Washington never provided Malone with the notarized power of attorney, the agreement, according to Malone, was not a real agreement.

This argument is wholly without merit. The lease was signed; Malone surrendered its authority for interstate commerce to Washington. No restrictive language was appended to the lease agreement concerning the power of attorney. All the formalities were observed. Moreover, Malone's own records fail to support its contention that the lease was terminated due to the lack of the power of attorney. The termination notice states that Washington's lease was terminated because he had never carried a single load of Malone freight. Malone clearly expected that Washington would be working for Malone; he was fired because he had not done so.

■ Citing the "statutory employment doctrine," Graham claims Malone is liable for the negligent acts of Washington. The statutory and regulatory provisions which create liability based on statutory employment were contained in 49 U.S.C. § 11107(a)(4) (1982) ("the Interstate Commerce Commission may require a motor carrier ... that uses motor vehicles not owned by it to transport property under an arrangement with another party to ... have control of and be responsible for operating those motor vehicles in compliance with requirements prescribed by the Secretary of Transportation on safety of operations and equipment, and with other applica-

ble law as if the motor vehicles were owned by the motor carrier.")[11] In the past, motor carriers leased trucks and then disclaimed any responsibility when those same trucks injured members of the public. One major concern was the fact that "the use of non-owned vehicles led to public confusion as to who was financially responsible for accidents caused by those vehicles." *Empire Fire and Marine Ins. v. Guaranty Nat. Ins.*, 868 F.2d 357, 362 (10th Cir.1989). Congress enacted the statutory employment rules in 49 U.S.C. § 11107 to "stem the unregulated use of non-owned vehicles that threatened both public safety and the vitality of the trucking industry." *Integral Ins. Co. v. Lawrence Fulbright Trucking*, 930 F.2d 258, 260 (2d Cir. 1991).

The doctrine is simple: A carrier-lessee is liable as a matter of law for accidents that occur while a lease is still in effect.[12]

■ The application of the statutory employment doctrine to these facts is not so simple. Malone terminated its lease with Washington on April 27, 1993, but Washington did not learn of the termination until after the accident had occurred. Malone

sent its termination notice by certified mail to the address Washington provided on the last page of the lease, the address that was specified for contract purposes.[13] According to the returned envelope, the post office tried to deliver the letter to Washington's residence on two occasions. The first notice was on May 5, 1993; the second notice was on May 11, 1993; and the letter was returned to Malone on May 19, 1993. Under the terms of the lease, notification sent by mail was to be deemed effective two days after it was sent. As a matter of contract law, the lease was cancelled on April 29, 1993.

The plaintiff repeatedly points out that the vehicle identification materials, including the ICC placards, were not returned to Malone until July 17, 1993, two months after the accident occurred, and three months after the lease was terminated. The plaintiff argues Malone had an affirmative obligation to get the materials back from Washington, and if it did not, it is liable.

Current ICC regulations no longer impose an affirmative duty on the carrier to recover vehicle identification materials when a lease is terminated.[14] Instead, the regulations

---

11. The ICC Termination Act of 1995, 109 Stat. 803 (1995), repealed 49 U.S.C. § 11107, but the same language is repeated in the ICC Termination Act, 109 Stat. 890–91 (1995), to be codified at 49 U.S.C. § 14102(a)(4). "The Secretary [of Transportation] may require a motor carrier ... that uses motor vehicles not owned by it to transport property under an arrangement with another party to ... (4) have control of and be responsible for operating those motor vehicles in compliance with requirements prescribed by the Secretary on safety of operations and with other applicable law as if the motor vehicles were owned by the motor carrier." Moreover, the regulations promulgated under 49 U.S.C. § 11107 are still valid and still impose liability based·on a valid lease. "The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 1057.12 (1996).

12. There is a split in authority as to whether the existence of the valid lease creates an irrebuttable or a rebuttable presumption of statutory employment. The majority view is that an irrebuttable presumption is created. *See Rodriguez v. Ager*, 705 F.2d 1229 (10th Cir.1983); *Wellman v. Liberty Mutual Ins. Co.*, 496 F.2d 131 (8th Cir. 1974); *Proctor v. Colonial Refrigerated Transp. Inc.*, 494 F.2d 89 (4th Cir.1974); *Mellon Nat'l Bank and Trust Co. v. Sophie Lines, Inc.*, 289

F.2d 473 (3d Cir.1961). The First Circuit has not taken a position on the issue.

13. The plaintiff points out that Malone had several addresses on file for Washington. However, there was one particular address specified for lease purposes. The lease provided that all notices were to be sent to "the individual named and at the address shown on p. 22 here of this Agreement." In actuality, the names and addresses of the contracting parties appeared on p. 23. The name and address for Washington read as follows: Jerome Washington, Rt. 1, Box 280, Callahan, FL, 32011, 904–845–4492. This is the address listed on the certified mail receipt.

14. Prior to 1986, in order to terminate a lease, a carrier had to remove any identifying legends on the truck and obtain a receipt specifically identifying any returned equipment. 49 C.F.R. 1057.4(d) (1985). These requirements were repealed in a series of ICC amendments in 1986. In its notes to these amendments, the ICC emphasized that liability should not be assigned on the existence of placards alone. ICC, Lease and Interchange of Vehicles (Identification Devices); Ex Parte No. MC–43 (Sub. 16), 1986 *Federal Carrier Cases* Para. 37,283 at 47,344 (Oct. 10, 1986). However, the ICC left open the possibility that a lease could be terminated, but a carrier

provide that a lease shall specify which party has the obligation to remove the identifying materials and whether or not a receipt for the equipment is required. 49 C.F.R. § 1057.12(e) (1996). The Malone–Washington lease included these provisions: Washington was obligated to return the vehicle identification materials to Malone within fifteen days of termination. A section for a receipt was part of the lease agreement, but was not marked as required for cancellation.

In *Tartaglione v. Shaw's Express, Inc.*, 790 F.Supp. 438 (S.D.N.Y.1992) (construing the 1986 amendments to the ICC regulations), the court was presented with a similar situation. An injured plaintiff sued a carrier-lessee, arguing that the carrier should be held liable under the statutory employment doctrine. The carrier had terminated its lease with the owner-operator two months before the accident occurred. The court held that the carrier was not liable because it had properly terminated the lease, despite the fact that its decal was still on the side of the truck when the accident occurred. *Id.* at 443. The carrier had notified the owner by certified mail of the cancellation, and the owner had signed the acknowledgement of receipt; this notice was in accordance of the lease terms. *Id.*[15]

■■■■ The plaintiff next argues Malone should be liable because the notice it sent was ineffectual. But Malone proceeded in accordance with the terms of the contract. "The intention of the parties controls a written contract, and the intention of the parties is to be derived from the contract itself, where the language is plain and unambiguous." *Logan v. Citizens Nat'l Bank of Opp*, 460 So.2d 1239, 1242 (Ala.1984); *see also Utilities Bd. of City of Tuskegee v. Town of Notasulga*, 530 So.2d 228, 230 (Ala.1988). Moreover, the plaintiff's contention that notice by mail was inadequate does not justify disregarding a specific provision of the lease. "A court may not construe a contract which is by its terms plain and free from ambiguity, but must enforce it as written." *See P & S*

*Business, Inc. v. South Central Bell Telephone Co.*, 466 So.2d 928, 931 (Ala.1985) (holding written cancellation provision is free from ambiguity and must be enforced as written).

In contrast to the plaintiff's arguments about ineffectiveness, written notice was the most sensible form of notice for these parties. The general purpose of written notice is to "avoid controversy and make more certain the rights of the parties." *Birmingham News Co. v. McConnell et al.*, 225 Ala. 30, 141 So. 678, 681 (1932). Presumably, since Washington was to be out on the road, delivering Malone's freight, it made sense to designate an *address* for notice purposes. Unlike Washington's location, the address would not change, and this enabled Malone to send communications to one place. Since the notice provision is unambiguous and part of the contract, it should be enforced as written.

■■■■ Plaintiff urges this Court to consider that under Alabama law, the notice provision could be stricken from the contract if a court found that it was unconscionable. I decline to find that the provision is unconscionable. Rescission of a contract or a contract provision due to unconscionability is an "extraordinary remedy." *Layne v. Garner*, 612 So.2d 404, 408 (Ala.1992). Generally, unconscionability includes an absence of meaningful choice on the part of one of the parties; often, the unequal bargaining power of the parties gives rise to an unconscionable contract. *Advertiser Co. v. Electronic Engineers, Inc.*, 527 So.2d 1317 (Ala.App.1988) (citations omitted). A court needs to ask "(1) whether there was an absence of meaningful choice on one party's part; (2) whether the contractual terms are unreasonably favorable to one party; (3) whether there was unequal bargaining power among the parties; and (4) whether there were oppressive, one-sided or patently unfair terms in the contract." *Layne*, 612 So.2d at 408.

It is true that the lease agreement was a standard contract Malone used with all its owner-operators. However, the fact that it

still liable under state contract, agency, or tort law. *Id.*

**15.** In contrast, Washington never acknowledged receipt of the letter of termination, but the lease made notice sent by mail effective on the second day.

was a standard contract does not mean the notice provision should be excised by this Court. First, the notice provision applied with equal force to Malone. If Washington had decided he wanted to terminate the lease, he would have been able to send notice of termination in the mail to Malone and it would have been effective two days later. Second, the provision was well-suited to a contract between parties involved in the business of interstate commerce. As a result, the provision is not so clearly unfair that it should be stricken from the contract.

The plaintiff also claims that the lease was not properly terminated because Malone did not give Washington a receipt for his equipment. The lease does contain a blank section for a receipt marked, "In the event of cancellation." In its termination letter, Malone asked that Washington return its vehicle identification materials and the lease agreement, "after completing the receipt for equipment section." However, plaintiff fails to show that the receipt was *required* for lease termination. The mere existence of the space for a receipt does not mean it is a prerequisite for proper termination. I decline to find a receipt was necessary for proper lease termination.

■ Finally, the plaintiff emphasizes the underlying public policy rationale for the statutory employment doctrine, which I agree, is critically important. But the federal scheme to regulate motor carriers does not abrogate state contract law. The ICC encouraged courts confronted with situations where a lease has been terminated, but ICC placards are still displayed, to resolve the issues on the basis of applicable state tort, contract, or agency law. It refused to impose broad-based liability based on placards and insignia.

■ In sum, since the contract was terminated according to its legal terms, Malone is not contractually liable under the lease for the May 21, 1993 accident.[16]

## 2. Liability Deriving from Malone's Negligent Entrustment of its Authority for Interstate *Commerce*

The plaintiff has also argued that Malone is liable directly for its negligent entrustment of its ICC materials to Washington. Malone has questioned whether Massachusetts law applies, but has not cited any other law this court should look to. As I have found, *supra*, Alabama law should govern this claim since the site of the negligent entrustment was Alabama, where Malone is based.

■ The plaintiff asserts that Malone negligently entrusted its interstate commercial authority to Washington when he was not properly licensed for interstate commerce. Assuming Malone's authority for interstate commerce is a chattel that can be entrusted, for this claim to succeed, Graham would have to prove the following elements: (1) that Washington was incompetent, inexperienced, or reckless; (2) that Malone knew or had reason to know of Washington's condition or proclivities; (3) that the chattel was entrusted; (4) that the entrustment created an appreciable risk of harm to the plaintiff; and (5) that the negligence of the defendant proximately caused the harm to the plaintiff. *See Wilbanks v. Brazil*, 425 So.2d 1123, 1124 (Ala.1983) (citing *Restatement (Second) of Torts* § 390 (1979)).

The plaintiff's negligent entrustment claim is somewhat novel. Washington owned the trailer and was making payments to Sabree on the tractor; clearly, Malone could not negligently entrust the tractor-trailer to its owner, though under the lease, Washington furnished Malone with "the exclusive possession, control and use of the equipment." But Malone did provide Washington with "all

---

**16.** The plaintiff also argues Malone is liable on the basis of *respondeat superior*. This approach revives the same arguments the plaintiff made in the contract section and is no more persuasive. Malone argues that the plaintiff cannot prove the required elements of *respondeat superior* because the accident involved an unauthorized haul by Washington for ECT. The Alabama law of *respondeat superior* requires that the plaintiff show

that the negligent act was done within the scope of employment and committed in the accomplishment of objects within the line of duties of the employer. *See Jessup v. Shaddix*, 275 Ala. 281, 284, 154 So.2d 39, 41 (Ala.1963). But since Malone had terminated the lease as of April 29, 1996, *respondeat superior* is not a basis for recovery and the issue of whether the ECT haul was authorized is not relevant.

identification required by any governmental agencies" to haul goods in interstate commerce. Without the appropriate identification materials, Washington would not have been able to use the tractor-trailer to haul interstate commerce.

Restrictions on Washington's license include: "Corrective Lenses, Outside Mirror, and CDL [Commercial Driver's License] Intrastate Only." The driving transcript record cites these restrictions and notes at the bottom: "NOTE: SOME LICENSES ISSUED BY THE STATE OF FLORIDA ARE VALID IN FLORIDA ONLY. THIS RESULTS FROM APPLICANT RETAINING A VALID LICENSE FROM ANOTHER JURISDICTION."

Malone argues that this phrase proves that Washington's license may not have been totally restricted to intrastate commercial activity. But the record does not contain any other licenses for Washington, and on Washington's transcript, the section for "Prior State and Driver License Number" is blank. There is also no evidence that Washington provided another driver's license to Malone. Florida provides that the department of motor vehicles can impose "any suitable restrictions on use of the license with respect to time and purpose of use, including ... a restriction providing for intrastate operation only ..." to promote safety or driver improvement. Fla.Stat.Ann. § 322.16 (West 1996). Malone admitted that it would not have executed a lease with Washington had it known his license was restricted for commercial purposes to intrastate use.[17]

But even assuming, *arguendo*, that Washington's license did not allow him to transport any goods in interstate commerce, Malone is still not liable to the plaintiff. Graham cannot prove that Malone's negligent entrustment of its interstate commercial authority caused the May 21, 1993 accident. Even if Washington was ineligible to transport any goods outside the borders of Florida, the termination of the Malone lease precludes Malone's liability for the accident. Perhaps Malone should never have signed the lease with Washington at all, but the lease was no longer valid on May 21, 1993.

Nor was Malone's ICC authority even required for the shipment of cucumbers to Massachusetts. Washington was in Massachusetts on a haul of cucumbers brokered by ECT; this activity is specifically exempted from the ICC's jurisdiction because cucumbers are agricultural products. 49 U.S.C. § 10526(a)(6)(B) (1982) ("The ICC does not have jurisdiction under this subchapter over ... transportation by motor vehicle of ... agricultural or horticultural commodities").[18] Malone's interstate authority for interstate commerce was not even required for this particular haul. Consequently, Graham cannot prove that "but for" Malone's authority, Washington would not have been in Massachusetts. Since the lease was terminated and the items plaintiff has alleged were negligently entrusted could not have caused the accident, Graham's negligent entrustment claim against Malone fails.

### 3. Liability Deriving from the tractor-trailer's registration in Illinois and the Illinois *Mandatory Insurance Law*

The plaintiff and ECT argue that Malone was Washington's insurer and, as a result, is liable to Graham for her injuries. Malone's obligation to insure derived from three sources: (a) the lease; (b) ICC regulations; and (c) the mandatory insurance law of the state in which the tractor-trailer was registered.

---

**17.** However, Malone claims that it did have a vision waiver for Washington from the Federal Highway Administration ("FHA"), allowing Washington "to operate a CMV in interstate commerce." The waiver was dated April 21, 1993. Graham alleges that the waiver is further evidence of Malone's negligence because Malone only obtained the vision waiver six days after Malone and Washington signed the lease agreement on April 14, 1993, although Washington had failed an eye test at Malone's facilities. Malone claims the waiver was on file at its offices from the 1992 lease it executed with Washington. Malone's position is supported by the fact that the waiver states that its effective date is 10–01–92 and its expiration date is 10–01–95.

**18.** As part of the ICC Termination Act, 49 U.S.C. § 10526 was repealed. The ICC Termination Act now exempts "transportation by motor vehicle of ... agricultural and horticultural commodities." 109 Stat. 862 (1995), to be codified at 49 U.S.C. § 13506(a)(6)(B).

The lease provided that Malone would add Washington to its public liability insurance: "[p]ursuant to the rules and. regulations of the ICC and other regulatory agencies, Malone shall maintain at its own expense public liability, property, and cargo insurance coverage as concerns shippers and the general public and name CONTRACTOR [Washington] as an additional insured."

The ICC requires Malone to maintain insurance or other security "sufficient to pay . . . for each final judgment against the carrier for bodily injury to, or death to, an individual resulting from the negligent operation, maintenance, or use of motor vehicles under the [carrier's] .certificate or permit, or for loss of damage to property or both." 49 U.S.C. § 10927(a)(1) (1982).[19] In the period in question, Malone was required to maintain coverage up to $1 million per occurrence. It elected to self-insure, a decision the ICC approved on April 1, 1991.

■ However, the certificate of insurance Malone provided to Washington states that the contractor "continue[s] to be insured so long as there is a Permanent Lease in effect . . . which is specifically related to the covered auto listed." Regarding the termination of coverage, the certificate states:

> As respect [to] each Certificate Holder [Washington], termination of the insurance shall coincide with the termination or cancellation of his or its lease agreement with the Named Insurance Carrier. As respect [to] each covered auto [the tractor-trailer], the insurance shall terminate when the automobile ceases to be subject to a lease agreement with the named Insured Motor Carrier.

Because Malone properly terminated the lease on April 29, 1993, the ICC-required insurance covering Washington was terminated on April 29, 1993 as well.

■ But the plaintiff cites an additional basis for recovery: the Illinois Mandatory Insurance Law, codified at Ill.Stat.Ann. c. 625, ¶¶ 5/7–601 (Smith–Hurd 1996). Typically, mandatory insurance laws "require proof of a satisfactory liability policy as a condition precedent to the issuance of valid auto license plates." *Springfield Fire & Casualty Co. v. Garner,* 255 Ill.App.3d 685, 692, 194 Ill.Dec. 505, 627 N.E.2d 1147 (Ill.App.Ct. 1993).

Malone registered the tractor-trailer in Illinois. The registration process had two steps. First, on April 15, 1993, Malone obtained Illinois IRP Temporary Apportionment Authorization Permit # JPT 165431 for the tractor-trailer. The permit was valid for 45 days from the date of issuance, until May 30, 1993. According to the Illinois Secretary of State, the temporary ·authorization was never cancelled. Second, on April 21, 1993, Illinois license plate # P42214 was transferred .to Washington's vehicle. The Illinois vehicle registration was in both Sabree's and Malone's names, and the plate was valid for one year. Malone did not cancel the registration until after the date of the accident (May 21, 1993).

On June 17, 1993, Malone obtained an "Affirmation of a Lost/Stolen Plate" from the Secretary of State; the affirmation listed the "date stolen" as April 27, 1993. On June 28, 1993, Malone requested the Illinois Secretary of State issue a replacement plate # P42214 since the original plate had not been returned. Consequently, the registration for Washington's vehicle remained in effect until at least June 17, 1993, the earliest date that the Illinois Secretary of State was notified that the plate had been stolen.

Thus, at the time of the accident, the registration for the tractor-trailer was still valid. The plaintiff claims this still-valid Illinois registration required Malone to provide insurance since Malone's permit clerk signed a statement on the Illinois registration application promising Malone would abide by the Illinois Mandatory Insurance Law "if applicable."

The Illinois Mandatory Insurance Law states that:

> No person shall operate, register, or maintain registration of, and no owner shall

---

**19.** The ICC Termination Act of 1995 repealed 49 U.S.C. § 10927(a)(1). However, the Act still requires public liability insurance for motor carriers. 109 Stat. 885 (1995), to be codified at 49 U.S.C. § 13906(a)(1).

permit another person to operate, register or maintain registration of, a motor vehicle designed to be used on a public highway unless the motor vehicle is covered by a liability insurance policy.

Ill.Stat.Ann. c. 625, ¶¶ 5/7–601 (Smith–Hurd 1996).

Malone argues its vehicles are exempted from the provisions of the Illinois Mandatory Insurance Law because they are covered by other insurance, namely the ICC-required insurance. Illinois exempts "other vehicles complying with laws which require them to be insured in amounts meeting or exceeding the minimum amounts required under this Section." Ill.Stat.Ann. ch. 625, para. 7–601(b) (1996). Since the self-insurance that Malone maintained, required by the ICC for interstate motor carriers, exceeded the minimum amounts required by Illinois law,[20] it argues that it was not covered by the Mandatory Insurance Law.

However, the ICC-required insurance for Washington's tractor-trailer ended on April 29, 1993, when the lease terminated. Neither Malone nor Washington made an effort to obtain new insurance after April 29, 1993. Since the tractor-trailer was still registered in Illinois, and since Malone was a co-registrant, plaintiff and ECT argue that Malone remained Washington's insurer until the registration was cancelled.

Malone points out that the Illinois law is written in terms of coverage of vehicles, not drivers. According to Malone, the lack of a statutory provision requiring a lessee to cover a lessor's use of formerly leased equipment after the lease has terminated demonstrates that coverage is not required. "Where the Illinois legislature has desired *vehicle owners* to provide insurance for permissive *vehicle users*, it has specifically stated so by statute." *Steinberg v. Universal Underwriters Ins. Co.*, 272 Ill.App.3d 79, 82, 208 Ill.Dec. 743, 650 N.E.2d 14 (Ill.App.Ct. 1995) (citing statutes requiring coverage for rental car drivers and taxicab users and holding that no requirement of coverage exists

for a automobile dealership customer) (emphasis added).

Plaintiff claims this "maintenance" of the tractor-trailer's registration, between April 29, 1993 and June 17, 1993 carries Malone's insurance obligations forward to insure Washington even after the cancellation of the lease. Admittedly, Malone could have cancelled the vehicle registration on the same day that it cancelled the lease, April 27, 1993. It was, however, waiting for Washington to return the materials.

Nevertheless, the typical remedies for registration of an uninsured vehicle include suspension of registration or the suspension of a license, not deeming the vehicle covered by insurance. When the Illinois Secretary of State determines that an *owner* has registered or maintained the registration of a motor vehicle without a liability policy, the Secretary "shall notify the owner that such owner's vehicle registration shall be suspended 45 days after the date of the mailing of the notice unless the owner within 30 days furnishes proof of insurance." Ill.Stat.Ann. c. 625, ¶¶ 5/7–605 (Smith–Hurd 1996) (emphasis added).

Deeming Malone an insurer due to the failure to terminate the registration is not a remedy permitted by Illinois law. *Cf. James v. Bank of Highland Park*, 82 Ill.App.2d 118, 226 N.E.2d 404 (Ill.App.Ct.1967) (holding that violation of statute requiring removal of registration plates on the transfer of an automobile did not apply to a guarantor who did not have title or possession of automobile and that the failure to remove the plates did not proximately cause plaintiff's injury since negligence did nothing more than furnish condition by which injury was made possible).

To be sure, plaintiff's argument has some initial appeal because Malone is a self-insurer. But if Malone were insured by an outside agency, such as Allstate, no court would deem Allstate's coverage continued simply because a third party that had already cancelled an underlying lease for a vehicle, had not also cancelled the vehicle's registration.

---

**20.** $20,000 per person and $40,000 per occurrence for bodily injury. Ill.Stat.Ann. c. 625, ¶¶ 5/7–203 (1996).

The situation should be no different with a self-insurer. Consequently, the plaintiff's argument that Malone was still Washington's insurer on the date of the accident fails.

### C. *Claims Against ECT*

#### 1. Liability Deriving from ECT Negligence in Failing to Determine Whether Washington was Properly *Licensed or Insured*

Plaintiff claims that ECT is liable because it negligently failed to determine whether Washington was properly licensed or insured when it hired him for the Massachusetts cucumber shipment. ECT has moved for summary judgment against the plaintiff, claiming it relied on Malone's authority for all of the hauls for which it hired Washington.

As a broker, ECT acts as an intermediary between shippers and carriers. Since it has no ICC operating authority of its own, ECT uses operators leased to authorized carriers, such as Malone. ECT also does not have insurance for the operators it hires. As a result, ECT has to rely on the insurance the operator has from a carrier or on the operator's own insurance.

 There are disputed material facts relating to whether ECT actually determined whether or not Washington was leased to Malone.[21] But ECT's reliance on Malone is irrelevant because the shipment Washington was transporting at the time of the accident involved agricultural commodities, items which are specifically exempted from the ICC's jurisdiction when shipped by motor vehicle. 49 U.S.C. § 10526(a)(6)(B) (1982)

("The ICC does not have jurisdiction under this subchapter over ... transportation by motor vehicle of ... agricultural or horticultural commodities").[22] As a result, ECT did not need to rely on Malone's authority for the haul; so assuming ECT did contact Malone, and received inaccurate information about Washington, it would not have mattered because Malone's authority for interstate commerce was not required for Washington's May 21, 1993 haul.

Thus, Plaintiff has a claim for ECT's direct negligence in hiring Washington for hauls when his insurance coverage was in doubt, and when he apparently did not have an interstate driver's license. Given the disputed material facts relating to the adequacy of ECT's inquiries regarding Washington's status, the ambiguities surrounding the conditions of the Florida licensing and other issues, I find this is not an appropriate ground for summary judgment and ECT's motion is **DENIED.**

### D. *93A and 176D Violations*

Plaintiff claims that Malone and CRST, Malone's "parent" company that acted as Malone's insurance adjuster, violated M.G.L. ch. 93A § 2 (1996) and M.G.L. ch. 176D § 3(9)(f) (1996) when it failed to make an effort to settle the plaintiff's claim. 93A § 2 declares unlawful any "unfair or deceptive acts or practices in the conduct of any trade or commerce"; 176D § 3(9)(f) states that it is an unfair claim settlement practice to fail to "effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." Coordinating 176D and 93A is consistent with the broad policy of

---

**21.** Arrangements between brokers and carriers are common in the trucking industry. Malone authorizes extra hauls for an operator by issuing a release number to the operator for each extra load. According to Malone, ECT never sought permission for any hauls by Washington. Malone has included computer records for the 4/3/93–5/3/93 time period, listing the authorized brokered loads; there is no entry for any load hauled by Jerome Washington. ECT Chief Executive Officer, Daniel J. Latta, states that ECT did contact Malone regarding permission for the extra loads and received evidence of insurance from Malone and a copy of Malone's operating authority. But the ECT employee who allegedly contacted Malone regarding Washington's extra

hauls, Bob Fiore, has since passed away. Additionally, ECT claims it relied on Malone's vehicle identification materials displayed on Washington's tractor-trailer. Washington also claims he had Malone's permission to haul ECT loads; he says he obtained the permission from a Malone employee named Bill, a dispatcher at Malone's Martins Ferry, Ohio office.

**22.** As part of the ICC Termination Act, 49 U.S.C. § 10526 was repealed. The ICC Termination Act now exempts "transportation by motor vehicle of ... agricultural and horticultural commodities." 109 Stat. 862 (1995), to be codified at 49 U.S.C. § 13506(a)(6)(B).

Massachusetts courts in construing 93A "to go for fruitful analogy to standards established by cognate statutes, common law rules, or other sources." *Miller v. Risk Management Found. Harvard Medical Institutions, Inc.*, 36 Mass.App.Ct. 411, 418, 632 N.E.2d 841 (1994) (specifically approving of trial court's use of 176D in conjunction with 93A). Graham argues these principles apply with equal force to entities that act in functions analogous to insurance adjusters, and since CRST acted as Malone's adjuster, it violated 93A and 176D when it refused to settle her claim. *See Miller*, 36 Mass.App. Ct. at 415, 632 N.E.2d 841 (holding that though Risk Management not in the business of insurance, its role in handling claims against the Harvard hospitals was "done in a business context" and subjected it to 93A liability).

■ Assuming CRST did act as an adjuster for Malone, plaintiff's claims are insufficient. As discussed above, Malone's lease with Washington had been terminated according to its terms one month prior to the date of the accident, and notice had been sent out to Washington under the terms of the contract. Consequently, I find there was a good faith basis for Malone and CRST to believe that Graham's claims were not worth settling since liability was not reasonably clear. As a result, plaintiff's 93A and 176D claims fail.

## V. CONCLUSION

The court concludes, based on the undisputed evidence, as follows:

1) On April 29, 1993, the lease between Malone and Washington was terminated.

2) On May 21, 1993, Washington was involved in an accident with Graham while on a haul arranged by ECT.

3) That haul involved the shipment of agricultural commodities and did not require interstate commercial authority.

4) Malone's authority for interstate commerce, whether negligently entrusted to Washington or not, could not have caused the accident.

5) On April 29, 1993, any insurance Malone provided under the lease terminated as well.

6) Malone was not the insurer of the tractor-trailer at the time of the accident.

7) There are substantial issues of fact with respect to Graham's claims against ECT, including whether ECT adequately investigated Washington's status before it assigned him work, and the significance of the limitations on Washington's Florida license.

For the foregoing reasons, defendant's motion for summary judgment is **ALLOWED**.

**SO ORDERED.**

### ORDER

For the reasons set forth in the accompanying Memorandum and Order, I have addressed the following motions:

1. Motion for summary judgment by plaintiff Graham [docket entry # 32], is **DENIED**;

2. Motion for summary judgment by defendant East Coast Transport [docket entry # 35], is **DENIED**;

3. Motion by defendant CRST, Inc., et al, for summary judgment and oral argument [docket entry # 39], is **ALLOWED**;

4. Motion by defendant East Coast Transport to amend cross-claim [docket entry # 49], is **ALLOWED**;

5. Motion by defendant Malone Freight Lines to submit reply memo in support of cross-motion for summary judgment against plaintiff [docket entry # 55], is **ALLOWED**;

6. Motion by defendant Malone Freight Lines to compel production of psychologist's records [docket entry # 61], is **MOOT**; and,

7. Motion by plaintiff Graham for protective order barring disclosure of certain records [docket entry # 64], is **MOOT**.

**SO ORDERED.**