**Jean C. GRAHAM, Plaintiff,**

v.

**MALONE FREIGHT LINES, et al., Defendants.**

No. 95–11496–NG.

United States District Court, D. Massachusetts.

June 11, 1997.

Jonathan J. Margolis, Lisa R. Valensi, Kushner & Sanders, Wellesley, MA, for Plaintiff.

Peter L. Puciloski, Sugarman, Rogers, Barshak & Cohen, PC, Boston, MA, Larry G. Gutz, Moyer & Bergman P.L.C., Cedar Rapids, IN, Thomas F.X Foley, Holmdel, NJ, for Defendants.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

Before me are two motions for reconsideration, one filed by defendant East Coast Transport ("ECT"), and one filed by plaintiff Jean C. Graham ("Graham"). The parties seek reconsideration of the Court's November 8, 1996 decision. *See Graham v. Malone Freight Lines et al.,* 948 F.Supp. 1124 (D.Mass.1996) (hereinafter "Decision"). In that decision, the Court denied ECT's motion for summary judgment, denied Graham's motion for summary judgment, but granted summary judgment for defendant Malone Freight Lines ("Malone"). On reconsideration, Graham's motion is **DENIED** in all respects, but ECT's motion is **ALLOWED** only with respect to its claim for summary judgment against the plaintiff. The Court also **CLARIFIES** its earlier order to state that ECT's claim for declaratory judgment holding Malone liable to the plaintiff is **DENIED.**

### I. FACTS

The facts are laid out in the earlier Decision, with only a brief discussion here. Graham and defendant Jerome Washington ("Washington") were involved in an auto accident in Wellesley, Massachusetts on May 21, 1993. At the time of the accident, Washington was transporting a load of cucumbers from Florida to Massachusetts. The haul had been arranged by ECT. ECT, a freight broker, acts as an intermediary for shippers and motor carriers and hires drivers who are usually leased to licensed motor carriers. The May 21, 1993, job was the fifth haul Washington had transported for ECT; he had begun accepting assignments from ECT on or about April 20, 1993.

Previously, on April 14, 1993, Washington had entered into a lease with Malone, a licensed motor carrier. In the lease,

Washington agreed to lease his tractor-trailer to Malone, and Malone agreed to provide its authorizations for interstate commerce to Washington and to provide work.[1] Malone canceled the lease on April 27, 1993; cancellation was effective April 29, 1993.

The accident which forms the basis of this litigation occurred on May 21, 1993. On that date, at approximately 9:00 a.m., Graham was driving her car north on Route 128 in Wellesley, Massachusetts. When Graham attempted to turn off Route 128, onto eastbound Route 9, the left side of her car was struck by a tractor-trailer. The tractor-trailer had been in the next lane, and according to the accident report, the driver's (Washington) failure to ensure that the exit lane was clear when he entered it caused the accident.

## II. *LEGAL STANDARDS*

Motions for reconsideration are appropriate when a court has made an error of apprehension or law. *Above the Belt, Inc. v. Mel Bohannan Roofing*, 99 F.R.D. 99, 101 (E.D.Va.1983). *See Canal Elec. Co. v. Westinghouse Elec. Co.*, 756 F.Supp. 620, 629 (D.Mass.1990) (allowing reconsideration where court agreed that its dismissal of the plaintiff's claims was improper on the grounds it advanced in its earlier ruling).

## III. *ANALYSIS*

ECT makes two separate challenges to the Court's decision. First, it contends the Court misapprehended the legal claims lodged against it by the plaintiff. Second, ECT asserts that the Court failed to appreciate the legal relationship it had with Washington, the driver involved in the accident with the plaintiff.

1.  Ownership of the tractor-trailer was complicated. The tractor was actually owned by defendant Malachi Sabree ("Sabree"), though Washington was making periodic payments to Sabree in an effort to purchase the tractor.

### A. *Negligent Entrustment*

ECT argues that the doctrine of negligent entrustment does not apply to its conduct. I agree; ECT could not have negligently entrusted anything to Washington. It could not have entrusted the tractor-trailer to Washington since Washington already owned the trailer and was making periodic payments on the tractor. It could not have entrusted any permits or authorizations to Washington. No permits were required for the haul since it involved agricultural commodities, which are exempt from interstate commerce permit requirements. ECT had simply hired Washington to transport a specific load.

I believe this conclusion was generally clear in my Decision, although there is some confusion in the section concerning choice of law. I note in the decision that any negligent entrustment claims against ECT would be governed by the law of New Jersey. This was inaccurate since there are no conceivable negligent entrustment claims against ECT because it did not "entrust" anything to Washington.

### B. *ECT's Liability for Actions by an Independent Contractor*

ECT also argues that it cannot be held liable for Washington's actions because he was only an independent contractor, not an agent. In concurrence with the analysis in my earlier Decision, I hold that New Jersey law applies to this claim. *Memorandum and Decision* at 11. ECT is in New Jersey and it hired Washington in New Jersey. Any breach of duty occurred in New Jersey. As a result, New Jersey law applies.

#### 1. *ECT and Washington's Relationship*

ECT argues that since Washington was an independent contractor, it is

Washington did, however, own the trailer; it was registered in Maine to J & E Truck Leasing. J & E Truck Leasing was a business name Washington used.

not liable for any torts he committed. Generally, an employer is not vicariously liable for torts committed by an independent contractor; however, an employer who "knowingly hir[es] an incompetent independent contractor may be held liable for the negligent actions of such contractor." *O'Keefe v. Sprout–Bauer, Inc.,* 970 F.2d 1244, 1252 (3d Cir.1992) (citing *Majestic Realty Assoc., Inc. v. Toti Contracting Co.,* 30 N.J. 425, 431, 153 A.2d 321 (1959)). The master's knowledge of the contractor's incompetence may be actual or constructive. *Cassano v. Aschoff,* 226 N.J.Super. 110, 114, 543 A.2d 973 (App. Div.1988). An employer is generally liable for torts committed by an agent. *Id.*

 The distinction between an independent contractor and an agent depends on the amount of control that the principal exercises. *Baldasarre v. Butler,* 132 N.J. 278, 291, 625 A.2d 458 (1993) (holding lack of control typifies the hiring of an independent contractor). The relationship between Washington and ECT resembles an independent contractor relationship not an agency relationship. ECT told Malone the location for the pick-up and the drop-off for the haul, as well as the timetable. It did not tell Malone which route to take; it did not perform inspections of his truck or monitor his progress along the way. As a result, since ECT exercised virtually no control over Washington's work, Washington was ECT's independent contractor, not its agent.

This characterization of the Washington–ECT relationship accords with other cases involving freight brokers. In *Tartaglione v. Shaw's Express,* 790 F.Supp. 438, 441–42 (S.D.N.Y.1992), the court held that the freight broker was not liable for an accident because the driver was acting as an independent contractor. First, the court noted that the federal regulations pertaining to freight brokers did not provide a separate basis for the plaintiff's claim. *Id.* at 443. While the Interstate Commerce Act ("ICA") imposed a duty on a broker to employ drivers leased to a motor carrier holding a certificate or permit issued by the Interstate Commerce Commission, it did not provide a private right of action for violations of its provisions. *Id.* Second, the court noted that *even if* the broker's failure to comply with the ICA could constitute prima facie negligence under New York law, the broker could still not be held liable for the driver's negligence since he was only an independent contractor. *Id.*

The same scenario is present in this case. Graham asserts that ECT breached its duty to non-negligently select a driver, i.e. that ECT hired someone who was not leased to a carrier, did not have a valid license, and did not have valid insurance.

### C. *ECT's Selection of Washington*

According to ECT, its agents did check with Malone and verified that Washington was an owner-operator for Malone, prior to Washington's selection. ECT also claims that Malone supplied it with evidence of insurance, a copy of its ICC operating authority, and the required license plates concerning Washington. ECT claims that it received all of this paperwork before it considered using Washington. He also said that this information was reconfirmed each time before Washington completed a haul.

Malone disputes these allegations; it has no records of any ECT calls, nor does it have release numbers for any of Washington's five hauls for ECT. The ECT hauls are also not reflected in Malone's computer records for authorized trips in April and May 1993. *See* Decision at 29 n. 21.

Looking at the facts in the light most favorable to the plaintiff, I assume both that the calls were not made and that the documents were not obtained. The question remains whether these facts trigger any liability on the part of ECT.

### D. *Possible Grounds for Negligence*

Graham argues ECT failed to select a driver who was adequately insured and

properly licensed and leased. These allegations—even if true—do not defeat summary judgment.

### 1. *Violations of the ICA*

■ Pursuant to the ICA, freight brokers are supposed to select drivers who are leased to motor carriers to provide transportation on its shipments. The ICA does not, however, provide plaintiffs with grounds for bringing tort suits. *See Tartaglione*, 790 F.Supp. at 443 (holding the ICA does not provide a private right of action). As a result, even if ECT failed to ascertain whether Washington did enjoy a valid lease at the time of the haul, the plaintiff still does not have a claim.[2]

### 2. *Financial Incompetence*

■ New Jersey does not allow the financial incompetence of an independent contractor to form the basis for a negligence claim against the employer. In a similar case, the Third Circuit held that an employer was not liable for the negligence of its independent contractor, even when it had not determined whether the contractor had adequate insurance or the required permits.

In *Robinson v. Jiffy Executive Limousine Co.*, 4 F.3d 237 (3d Cir.1993), a casino contracted with a limousine service to provide transportation for its patrons to and from the airport. The driver of one of the limousines suffered a fatal heart attack en route from the airport, causing the limousine to swerve into oncoming traffic on the New Jersey side of the Walt Whitman Bridge. Another car collided head-on with the limousine and the driver was killed.

The limousine passenger was also injured. *Id.* at 241.

The plaintiffs alleged two grounds for the casino's liability. First, they alleged that the limousine driver called the casino, prior to leaving the airport. In the call, the driver could have put the casino on notice that he was not feeling well, and the casino could have told the driver to complete the trip anyway.[3] Second, the plaintiffs alleged that the casino had not affirmatively investigated the limousine company's finances and insurance. Specifically, the limousine company was not on the casino's list of approved transportation services and was not approved by the Interstate Commerce Commission. The court held these facts did not suffice for a claim. *Id.* at 243.

The district court granted summary judgment for the defendants; the Third Circuit affirmed. The reasoning was a bit complicated. In a 1977 decision, *Becker v. Interstate Prop.*, 569 F.2d 1203 (3d Cir. 1977), *cert. denied*, 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978), the Third Circuit had predicted that the New Jersey Supreme Court was likely to hold that employing a financially irresponsible or uninsured independent contractor was tantamount to hiring an incompetent contractor. As time passed, however, it became clear that the New Jersey courts were not heading in that direction. In the interim, two intermediate appellate courts had held that the financial status of a contractor was not a sufficient ground for a principal's liability. *Cassano v. Aschoff*, 226 N.J.Super. 110, 543 A.2d 973, *certif. de-*

---

**2.** He had begun accepting assignments from ECT on or about April 20, 1993. Malone effectively canceled its lease with Washington on April 29, 1993. As a result, when ECT first hired Washington, he was still validly leased to Malone, so even if ECT had not called Malone, it did not breach its duty because the driver it hired was validly leased to a motor carrier.

**3.** The court found that there was no factual basis for a jury to infer that the casino knew

of the driver's health problems before the drive from the airport. No one heard the driver make the call, and even assuming the call had taken place, there was no evidence upon which a reasonable jury could conclude that the driver "informed Showboat of his physical state during that call, or that Showboat, if it had knowledge of the driver's precarious health, ordered the driver to proceed without assistance." *Id.* at 241.

*nied*, 113 N.J. 371, 550 A.2d 476 (1988); *Miltz v. Borroughs–Shelving*, 203 N.J.Super. 451, 497 A.2d 516 (1985).

Given the changes in the law, the district court in *Robinson* held that it was no longer reasonable to assume that the New Jersey Supreme Court would adopt a financial incompetence standard. The Third Circuit agreed, finding that there was insufficient evidence to raise a material dispute about the casino's breach of the standard of care. Reasonable care did not "impose an affirmative legal duty on Showboat to monitor the physical health of the limousine company's individual drivers, to investigate whether the independent contractor possessed all current permits required by law, or to adhere to self-imposed criteria." *Id.* at 243.

■ This decision, applying New Jersey law, suggests that even if ECT did virtually nothing to assure Washington was competent, it still would not have breached the standard of care.

Other decisions support ECT's position. In *Stone v. Pinkerton Farms*, 741 F.2d 941, 945–47 (7th Cir.1984), the defendant determined that its contractor-driver had a valid chauffeur's license and had received a good recommendation from his previous employer. It did not, however, check on the driver's driving record, the driver's permits, and the driver's insurance policies. But the Seventh Circuit still upheld the district court's grant of summary judgment for the defendant. First, though the driver had received six speeding tickets, the court held that the "recommendation of a prior employer was sufficient to satisfy the duty to exercise ordinary care." *Id.* at 946.

The liability insurance proved more troubling for the *Pinkerton* court. It discussed the "financial competence" issue and found no Indiana cases on point. *Id.* at 947. It held, however, the lack of liability insurance had no connection to the driver's negligence. *Id.* Though it con-

ceded that it could be argued that once the defendant determined the driver had no insurance—which it apparently did—it might have had a duty to inquire why. The court was reluctant to impose that duty on the defendant, and held that it had made an adequate investigation of the contractor's competence. *Id.*

### 3. *Interstate Commercial Permits and License*

■ Graham also argues ECT negligently selected Washington since he had a restriction on his driver's license which precluded him from operating a vehicle in interstate commerce. This also does not state a claim of negligence. On the Massachusetts haul, Washington transported cucumbers. As agricultural commodities, cucumbers are exempt from the permit requirements for interstate commerce shipments. 49 U.S.C. § 10526(a)(6)(B) (1982) (The ICC does not have jurisdiction under this subchapter over ... transportation by motor vehicle of ... agricultural or horticultural commodities).[4] As a result, even assuming ECT negligently failed to inspect Washington's license, that failure did not cause the accident. *See Stone v. Pinkerton Farms*, 741 F.2d 941, 946 (7th Cir.1984) (holding defendant had not breached the duty of care in failing to ascertain whether the driver had any permits since in any event, the driver "was exempt from the permit requirement because he carried agricultural products.").

## IV. *CONCLUSION*

For the foregoing reasons, ECT's motion for reconsideration is **ALLOWED**. The plaintiff's motion fails to persuade me that my original ruling was in error and is **DENIED**.

**SO ORDERED.**

---

4. As part of the ICC Termination Act, 49 U.S.C. § 10526 as repealed. The ICC Termination Act now exempts "transportation by motor vehicle of ... agricultural and horticultural commodities." 109 Stat. 862 (1995), to be codified at 49 U.S.C. § 13506(a)(6)(B).