Jean C. GRAHAM, Plaintiff, Appellant,

v.

MALONE FREIGHT LINES, INC.,
et al, Defendants, Appellees.

No. 98–2074.

United States Court of Appeals,
First Circuit.

Heard June 7, 1999.

Decided July 21, 1999.

Ordered Published Jan. 5, 2000.

Jonathan J. Margolis, with whom Jennifer L. Stuart, and Kushner, Sanders & Krone, LLP were on brief for appellant.

William L. Boesch, with whom Peter L. Puciloski and Sugarman, Rogers, Barshak & Cohen, P.C. were on brief for appellees, Malone Freight Lines, Inc., CRST International, Inc. and CRST, Inc.

Thomas F.X. Foley, with whom Fisher Fallon, William A. Sheridan and Flynn, Sheridan & Tabb were on brief for appellee, East Coast Transport, Inc.

Robert Digges, Jr., ATA Litigation Center, Susan S. Riedel, Erik Lund, George A. Berman and Posternak, Blankstein & Lund, were on brief for American Trucking Associations, Inc., Amicus Curiae.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and BOUDIN, Circuit Judge.

LEVIN H. CAMPBELL, Senior Circuit Judge.

On May 21, 1993, a tractor-trailer driven by Jerome Washington and owned by Washington and Malachi Sabree collided with an automobile driven by Jean C. Graham in Wellesley, Massachusetts. In this diversity action in the district court, Graham brought negligence claims against (1) Washington, (2) Sabree, (3) Malone Freight Lines, Inc. ("Malone"), which had leased the tractor-trailer from Washington and had provided the registration materials necessary to allow Washington to operate the tractor-trailer interstate, and (4) East Coast Transport, Inc. ("ECT"), the broker that had arranged for Washington to carry the load of cucumbers he was hauling at the time of the accident. After Washington and Sabree defaulted, the district court entered judgment against them and, after reviewing documentary evidence of Graham's injuries, awarded Graham $111,300 in damages, of which $40,000 was for pain and suffering. The district court granted summary judgment in favor of Malone and ECT on all claims.[1] Graham appeals from the grant of summary judgment in favor of Malone and ECT. She also contends that she was entitled to a jury trial on the amount of damages to be awarded in connection with the default judgments and, further, that the award for pain and suffering was unreasonably low. We *affirm* the judgment of the district court.

I.

The undisputed facts are well described in the district court's comprehensive opinion and need not be repeated in detail. *See Graham v. Malone Freight Lines, Inc., et al.,* 948 F.Supp. 1124 (D.Mass. 1996). We recite, in the light most favorable to Graham, only those facts most pertinent to our discussion of the issues on appeal.

Malone, based in Birmingham, Alabama, is an interstate motor carrier engaged in the business of transporting freight via truck under the jurisdiction granted formerly by the Interstate Commerce Commission.[2] As a condition of its operating authority, Malone was required to main-

---

1. The district court initially denied ECT's motion for summary judgment, but upon reconsideration granted the motion. *See Graham v. Malone Freight Lines,* 43 F.Supp.2d 77 (D.Mass.1997).

2. The Interstate Commerce Commission was abolished effective January 1, 1996. Its responsibility for regulating motor carrier transportation was vested by Congress in the Secretary of Transportation, and subsequently delegated to the Federal Highway Administration. ICC Termination Act of 1995, 109 Stat. 803 (1995), to be codified at 49 U.S.C. § 101 et seq.

tain insurance for its vehicles. *See* 49 U.S.C. § 10927(a)(1). On April 1, 1991, the ICC approved Malone's application to self-insure for bodily injury and property damage liability up to $1,000,000.

Washington, who was based in Florida, owned a trailer, and was making periodic payments toward the purchase of a tractor owned by Sabree. On April 14, 1993, Malone and Washington entered into a lease in which Washington promised to lease the tractor-trailer to Malone and act as driver, and Malone agreed to lend its authorizations for interstate commerce to Washington and provide hauls for him.[3] Under the terms of the lease, any breach of the lease covenants and promises gave either party an immediate right to cancel the lease. The lease provided that notice of cancellation could be by telephone or in writing. If notice of cancellation was in writing, the lease provided that written notice was "deemed to have been fully given ... on the second day after mailing ... by first class mail, registered or certified, postage prepaid, and properly addressed" to the relevant party.

Washington and Malone had entered into an earlier lease in October 1992, which was canceled by Malone on December 17, 1992 because Washington hauled an unauthorized load of freight. In connection with the execution of this earlier lease, Washington had presented to Malone a transcript, dated August 5, 1992, of his driving record from his home state, Florida. The transcript did not state that there were any restrictions in effect on Washington's operation of the tractor-trailer. On August 6, 1992, the state of Florida issued a conditional driver's license to Washington, valid only as to hauls within Florida. The record is unclear as to the reason for

the limitation and as to whether it remained in effect on the accident date, May 21, 1993. The restriction was noted on the face of Washington's driver's license in the form of a code notation—"AB2." The driver's license itself did not explain what "AB2" meant. Explanations for various such codes appear, however, at the bottom of the August 5 transcript. These indicated that "AB2" meant that a commercial driver's license is limited to intrastate hauls. The Florida transcript further stated: "SOME LICENSES ISSUED BY THE STATE OF FLORIDA ARE VALID IN FLORIDA ONLY. THIS RESULTS FROM APPLICANT RETAINING A VALID LICENSE FROM ANOTHER JURISDICTION." When Malone and Washington entered the lease on April 14, 1993, Malone relied upon the August 5, 1992, transcript of Washington's Florida driving record which, as already indicated, did not itself note that Washington's license was subject to the "AB2" or other limitation.

When Washington left Malone's offices on April 15, 1993, he had with him various vehicle identification materials provided by Malone, including door placards for the tractor in Malone's name, decals for the tractor-trailer with Malone's ICC number, a "cab card" that indicated Washington had Malone's permission to operate under its ICC authority, decals with Malone-assigned numbers, and forty-eight state decals indicating that applicable state taxes had been paid. Malone registered the tractor-trailer in Illinois. On April 15, 1993, Malone obtained a 45–day temporary permit for the tractor-trailer, which was valid until May 30, 1993. Malone also transferred an Illinois license plate, valid

---

**3.** It is common in the motor carrier industry for carriers to lease tractor-trailers from other parties and hire drivers as independent con-

tractors, on an as-needed basis, rather than maintain a permanent fleet of carrier-owned trucks and hire permanent drivers.

for one year, to Washington's tractor-trailer.[4]

Malone never arranged for any hauls for Washington under the lease. Malone asserts that Washington failed to contact a Malone dispatcher, as he had agreed to do under the lease. Washington contends that he was in contact with a Malone dispatcher. In any event, Malone believed that Washington had breached the lease. Consequently, on April 27, 1993, Malone sent, postage prepaid, a certified letter addressed to Washington's correct home address canceling the lease and requesting the immediate return of all of Malone's vehicle identification materials. The lease provided that upon cancellation, it would be Washington's responsibility to return all vehicle identification materials to Malone. After making two unsuccessful attempts to deliver the letter, on May 5 and May 11, the Post Office returned it to Malone on May 19, 1993. In the interim, Malone attempted unsuccessfully to reach Washington by telephone, although it was able to reach Washington's wife and inform her that the lease had been canceled. It is undisputed that Washington himself never received the certified letter.

On May 21, 1993, the date of the accident, Washington was transporting a load of cucumbers from Florida to Massachusetts. The haul had been arranged by ETC, a broker with no ICC operating authority of its own that acts as an intermediary between shippers and carriers and uses operators leased to licensed carriers. The May 21, 1993, haul was the fifth Washington had transported for ECT; Washington had begun accepting assignments from ECT on April 20, 1993.

At the time Washington's tractor-trailer collided with Graham's automobile, Washington carried the registration for the tractor-trailer that had been obtained by Malone and the tractor-trailer was marked with the Malone vehicle identification insignia that had been provided to Washington on April 15, 1993. On June 17, 1993, Malone reported to the Illinois Secretary of State that the license plate transferred to Washington's tractor-trailer had been lost or stolen. Malone sent a letter to Washington on June 18, 1993, reminding Washington that he was obligated under the lease to return the Malone vehicle identification materials. Washington returned the materials on July 17, 1993.

Graham's complaint, originally filed in state court but subsequently removed to federal district court in Massachusetts, alleged that Washington had negligently operated the tractor-trailer, and that Sabree, as owner of the tractor, was vicariously liable for her injuries. Graham alleged that Malone was also liable for her injuries because it (1) negligently entrusted the tractor-trailer to Washington despite the intrastate limitation that appeared on the face of his driver's license; (2) failed to cancel the tractor-trailer's Illinois registration prior to the accident; and (3) acted as Washington's "statutory employer" because Washington's truck bore Malone's ICC vehicle identification insignia at the time of the accident and still carried the Illinois vehicle registration. Graham alleged that ECT had negligently retained Washington to haul the load of cucumbers without first determining whether he had a valid license and permits and had negligently entrusted the tractor-trailer to Washington.

---

4. Malone used Illinois as its "base" for purposes of vehicle registration. It maintained a series of Illinois "apportioned" license plates. Upon commencement of a lease, Malone

would obtain authorization from the Illinois Secretary of State to transfer a plate number to the leased vehicle.

As Washington and Sabree did not appear, the district court entered default judgments against them. The district court did not hold a hearing on damages. Rather, the court reviewed documentary evidence, including affidavits submitted by Graham and members of her family, concerning Graham's injuries. The district court awarded $111,300 in damages on the claims against Washington and Sabree. Of that total, $40,000 was awarded for Graham's pain and suffering.

In its Memorandum and Order, the district court, after addressing several "thorny choice of law issues," granted summary judgment in favor of Malone. 948 F.Supp. at 1129. The court concluded that the lease between Washington and Malone had been canceled, in accordance with its terms, on April 29, 1993, two days after Malone had mailed a properly addressed certified letter to Washington. *See id.* at 1132. As the lease had been terminated several weeks prior to the accident, which occurred on May 21, 1993, the district court ruled that Malone could not be held liable under either a negligent entrustment theory or the federal "statutory employment" doctrine. The court further concluded that Illinois insurance law provided no basis for holding Malone liable after the cancellation of the lease. *See id.* at 1137.

With regard to ECT, the district court initially denied its motion for summary judgment. Upon reconsideration, however, the court granted summary judgment in favor of ETC. *See Graham v. Malone Freight Lines, Inc.,* 43 F.Supp.2d 77 (D.Mass.1997). The court ruled that ECT could not be held liable under a negligent entrustment theory, as it had no control over the tractor-trailer. *Id.* at 79–80. The district court further concluded that Wash-

ington was an independent contractor, and that ECT could not be held liable for Washington's "financial incompetence." *Id.* Finally, the court concluded that any negligence by ECT in failing to determine whether Washington had ICC authority to transport goods interstate was not a proximate cause of Graham's injuries, such authority not being necessary for the transport of agricultural products. *See id.* at 82.[5]

## II.

Graham contends on appeal that the district court erred in granting summary judgement in favor of Malone and ETC. She further argues that the district court erred in refusing to allow a jury trial with regard to damages against Washington and Sabree, and that the amount awarded for pain and suffering—$40,000—was unreasonably low. We review *de novo* the district court's summary judgment determination and its refusal to conduct a jury trial on damages. *See Lennon v. Rubin,* 166 F.3d 6, 8 (1st Cir.1999). We will reverse the district court's damages determination only upon a finding of clear error. *See Soto v. United States,* 11 F.3d 15, 18 (1st Cir.1993).

### A. *Claims Against Malone*

We can add little to the district court's thorough analysis of Graham's "negligent entrustment" and "statutory employment" claims against Malone. The district court correctly determined that the lease between Malone and Washington was terminated according to its terms on April 29, 1993, two days after Malone had mailed a certified letter of cancellation to Washington's home address. Thus, the lease was

---

**5.** The transporting of agricultural products was exempted from the ICC's jurisdiction. *See* 49 U.S.C. § 10526(a)(6)(B).

terminated several weeks prior to the accident, which occurred on May 21, 1993.

█ Although Graham points out that the lease agreement was a standard Malone form, she makes no convincing argument that the lease's notice of cancellation provision, was unconscionable or was for some other reasons invalid. Graham says that a carrier-lessee such as Malone should make "reasonable efforts" to notify a driver of the cancellation of a lease, but she does not explain why notice given by mailing a certified letter to the driver's designated address would be unreasonable. The written notice cancellation method provided for in the lease seems a practicable and sensible arrangement for parties like Washington and Malone, where Washington was likely to spend much of his time out on the road delivering loads.

█ Graham contends that Malone acted negligently in "entrusting" the tractor-trailer to one like Washington whose driver's license bore on its face an intrastate restriction although Malone was apparently unaware of the fact when it entered into the lease. Assuming, without deciding, that what Malone did amounted to an "entrustment" of the tractor-trailer, which Washington and Sabree in fact owned, the cancellation of the lease relieved Malone of any liability under a "negligent entrustment" theory. Once the lease was canceled, Washington ceased to operate under Malone's authority, on its behalf, or with its permission.[6]

█ The absence of a valid lease precludes imposition of vicarious liability against Malone under the "statutory employment" doctrine, which holds carrier-lessees vicariously liable for injuries resulting from the use of leased equipment. *See, e.g., Jackson v. O'Shields,* 101 F.3d 1083, 1086–87 (5th Cir.1996) (statutory employment doctrine applies only where valid lease of equipment is in effect). That Washington's tractor-trailer bore Malone's vehicle identification placards at the time of the accident does not constitute grounds for imposing vicarious liability against Malone. The lease provided that Washington was responsible for returning these materials to Malone upon cancellation.[7] The notice of cancellation sent to Washington's home on April 27, 1993 stated that any further use of Malone's ICC placards would be unlawful. While Washington himself apparently never received notice of cancellation, we conclude, as have other courts, that the presence of Malone's ICC placards does not vitiate the otherwise valid termination notice. *See id.* at 1088 (holding that presence of carrier's ICC insignia at time of accident did not provide basis for liability); *see also Tartaglione v. Shaw's Express, Inc.,* 790 F.Supp. 438, 442 (S.D.N.Y.1992) (same).

█ In her motion for summary judgment, Graham argued that Malone was an insurer against injuries arising from Washington's operation of the tractor-trailer under Illinois's mandatory automobile insurance law, 625 Ill. Comp. Stat. Ann. 5/7–601

6. This is true regardless of which state's law is applied. As the alleged entrustment occurred in Alabama upon execution of the lease, the district court applied Alabama law to Graham's negligent entrustment claim. Graham argues that Massachusetts law should apply, as the accident occurred there. It makes no difference. The Massachusetts statute upon which Graham bases her claim, Mass.G.L. ch. 90, § 12, prohibits any person from "allow[ing] a motor vehicle owned by him or under his control to be operated by any person who has no legal right to do so." As of April 29, 1993, when the lease was terminated, Graham ceased to operate with Malone's permission.

7. This provision complied with the ICC regulations, as amended. *See* 49 C.F.R. § 1057.12.

*et seq.,* having failed to cancel the truck's Illinois registration until after the accident.[8] The district court concluded that cancellation of the lease precluded holding Malone liable under the Illinois automobile insurance statute and that, in any event, "[d]eeming Malone an insurer due to the failure to terminate the registration is not a remedy permitted by Illinois law." 948 F.Supp. at 1137. In her motion for reconsideration, Graham abandoned reliance on the Illinois mandatory automobile insurance statute, asserting instead that Malone was liable under Illinois statutes requiring motor carriers operating within Illinois to retain on file with the Illinois Commerce Commission a certificate or other proof of insurance. *See* 625 Ill. Comp. Stat. Ann. 5/18c–4901 ("No motor carrier or property shall operate within this State unless it has on file with the Commission or its agent continuous insurance or surety coverage in accordance with Commission regulations"). At the time of the accident, Malone did in fact have a certificate of insurance on file with the Illinois Commerce Commission. The district court stated that Graham's shift in statutory focus "fails to persuade me that my original ruling was in error." 43 F.Supp.2d at 82.

We agree with the district court that Graham's argumentative change does not assist her. The cancellation of the lease undermines Graham's contention based upon the Illinois proof of insurance provisions. Section 4903 of Chapter 18c, upon which Graham now relies, provides, in part, that

> [e]ach certificate or other proof of insurance or surety coverage shall have, as an implied term, that the insurance or surety coverage will remain in effect continuously until notice of cancellation is filed

in accordance with Commission regulations, and that all motor vehicles *operated by or under authority of the carrier* will be covered, whether or not such vehicles have been reported to the insurance, surety, or other company.

625 Ill. Comp. Stat. Ann. 5/18c–4903 (emphasis supplied). Because the lease had been canceled before the accident, Washington's truck was no longer "operated by or under authority of" Malone. Thus, the maintenance by Malone of the Illinois insurance certificate provides no basis under Illinois law for holding Malone strictly liable as Washington's insurer.

For the foregoing reasons, we conclude that the district court did not err in granting summary judgment in favor of Malone on all claims against it.

### B. *Claims Against ECT*

At the time of the accident, ECT was an ICC licensed freight broker whose business involved matching customers (shippers of freight) with carriers. As a broker, ECT was not required to carry motor vehicle property damage, or personal injury or cargo loss insurance. Rather, ECT relied upon the carrier or operator to maintain insurance. The shipment of cucumbers being hauled by Washington from Florida to Massachusetts at the time of the accident had been arranged by ECT. ECT claims that prior to the shipment it contacted Malone to ascertain whether Washington was properly licensed and insured. Malone contends that it has no record of any inquiry having been made by ECT prior to the accident of May 21, 1993 concerning Washington's status. As we are reviewing a grant of summary judgment in favor of ECT, we shall assume

8. The district court found that the truck's registration was canceled, at the earliest, on June 17, 1993, the first date upon which Malone informed the Illinois Secretary of State that the truck's plates had been lost or stolen.

that ECT did not contact Malone prior to the May 21, 1993 haul to inquire as to Washington's status.

■] Graham claims that ECT is liable because it negligently failed to determine whether Washington was properly licensed and insured when it hired him for the Massachusetts cucumber shipment. The district court granted summary judgment in favor of ECT. The court concluded that Washington was an independent contractor and that ECT could not be held liable under New Jersey law for the negligence of an independent contractor.[9] *See* 43 F.Supp.2d at 80–82.

Graham's claim of negligence against ECT is not based upon principles of vicarious liability. Graham argues that ECT is liable for its own negligent hiring of Washington to undertake the cucumber haul. She claims that had ECT checked Washington's driver's license, which carried an "intrastate only" restriction on its face, ECT would not have hired Washington to take the cucumber haul.[10]

■ Graham concedes that Washington was hired not as an employee of ECT, but rather as its independent contractor. Employers are generally not liable for the negligent acts of the independent contractors they hire. But as the district court correctly noted, New Jersey law provides an exception to the rule precluding liability where an employer knowingly hires an incompetent independent contractor. *See* 43 F.Supp.2d at 79–80. But the evidence is lacking that ECT hired Washington with

the knowledge, actual or constructive, that Washington was incompetent or could not safely drive his truck. *See Cassano v. Aschoff,* 226 N.J.Super. 110, 114, 543 A.2d 973, 976 (App.Div.1988) (employee failed to establish knowledge by landowner that independent contractor lacked skill to perform competently). That Washington performed incompetently after he was hired by ECT does not suffice; nor does the fact that Graham raises a factual issue regarding Washington's authority to operate his truck interstate given the restriction placed upon his driver's license. *See id.*

■ Graham argues that ECT's failure to inspect Washington's license constitutes negligence. But there is no evidence that even had ECT done so, it would have gained knowledge that would have alerted it to any safety issues with regard to Washington's driving. An explanation of the "AB2" restriction appears in the Florida transcript of Washington's driving record, upon which Malone had relied when it entered into the lease with Washington. That explanation suggests, *supra* p. 10, that issuance of a license valid only in Florida may result from applicant's retention of a valid license from another jurisdiction. This explanation does not link the "AB2" in-state restriction to a driver's competence or poor safety record. Thus, there would have been no obvious connection between Washington's Florida-limited driver's license and his ability to safely drive the truck. Further, the limitation appears to be tied into the existence of

---

9. The district court properly determined that New Jersey law applied to the negligence claim against ECT because ECT, which is based in New Jersey, hired Washington in New Jersey, and any breach of duty by ECT occurred in New Jersey.

10. The district court concluded that ECT's failure to ascertain whether Washington's had ICC authority to transport goods interstate

was not the cause of the accident, as the cucumbers Washington was hauling were exempted from the ICC's jurisdiction and, thus, no ICC permits were required. *Id.* at 82. We agree that no ICC permits were required for the haul in question. The question is whether ECT can be found liable for hiring Washington despite the intrastate restriction on his driver's license.

other valid licensure elsewhere. On this record, we are unable to ascertain a sufficient issue of fact as to whether ECT failed to exercise due care in the hiring of Washington as an independent contractor, in that it should have concluded that he was incompetent or unsafe.[11]

■ Finally, Graham contends that ECT is liable because it hired an independent contractor without liability insurance. As the district court correctly held, New Jersey law does not impose liability upon employers for the financial instability of independent contractors. *See* 43 F.Supp.2d at 81–82.

We conclude that the district court properly granted summary judgment in favor of ECT.

## C. *Damages*

■ Finally, Graham contends that the district court erred in two respects in its computation of damages in connection with her claims against defaulting defendants Washington and Sabree. First, Graham argues that she was entitled to a jury trial with regard to damages. Neither the Seventh Amendment nor the Federal Rules of Civil Procedure require a jury trial to assess damages after entry of default in these circumstances. *See* Fed.R.Civ.P. 55(b)(2) (stating that court "shall accord a right of trial by jury to the parties when and as required by any statute of the United States"); *see also Eisler v. Strit-*

*zler,* 535 F.2d 148, 154 (1st Cir.1976) (jury trial not required to assess damages after default). Thus, Graham was not entitled to a jury trial on damages.[12]

■ Second, Graham argues that the district court's $40,000 award for pain and suffering was "unreasonable" because it was equal only to the amount of lost earnings through the date of judgment. The amount of damages awarded falls within the sound discretion of the fact-finder, here the district court. *See Soto v. United States,* 11 F.3d 15, 18 (1st Cir. 1993). An award for pain and suffering that happens to be equal to lost wages is not, as Graham suggests, *per se* unreasonable. Conclusory arguments attacking the reasonableness of a damages award fall well short of a demonstration of clear error. *See id.* We therefore uphold the district court's pain and suffering award.

### III.

For the foregoing reasons, the judgment is *affirmed.*

---

11. ECT had been working with Washington for approximately one month prior to the accident. The cucumbers were the fifth such load hauled by Washington for ETC since April 20, 1993. For all that appears, the four previous loads were handled by Washington satisfactorily and without any problems.

12. When the amount of damages are in dispute or are not ascertainable from the pleadings, a district court should hold a hearing after default to determine the amount of the award. *See Eisler,* 535 F.2d at 154. The

district court did not do so here, relying instead upon the documentary evidence submitted by Graham, including the affidavits from Graham's family members concerning Graham's post-accident pain and suffering. Graham does not argue on appeal that the district court should have held a hearing on damages, but rather that she was entitled to a jury trial. Thus, the issue of whether the district court should have held an evidentiary hearing has been waived.